## 7770

## STATE EX REL. WEEKS v. BOARD OF REGISTRATION OF AIKEN COUNTY.

GOVERNOR—CONSTITUTIONAL LAW—NEW COUNTIES.—After ordering an election on a proposed new county, the governor, or his successor, has authority to reconsider the matter and upon a satisfactory showing that some constitutional requirement has not been complied with or met to vacate the order of election, if no private or property right will thereby be destroyed.

Petition in the original jurisdiction of this Court by Luther W. Reese, W. R. Parks, Wade Woodward, J. Carey Lamar and James C. Gardner against the Boards of Registration of Aiken and Edgefield counties and the Commissioners of Election for said counties. The petition and exhibits on which the writs were asked are:

### PETITION.

"The petition of the above named relators respectfully shows:

1. "That the two first named are qualified electors and taxpayers of the county of Edgefield, and the three last named are qualified electors and taxpayers of the county of Aiken, all in the State aforesaid, and that they reside in those portions of said counties proposed to be cut off in the formation of the new county hereinafter mentioned.

2. "That heretofore relators, with others, similarly situated, filed a petition with his Excellency, M. F. Ansel, Governor of said State, for the formation of a new county out of portions of Aiken and Edgefield counties.

3. "That said petition was duly referred to a commission appointed by his Excellency in accordance with the provisions of the Act of February 21, 1905.

4. "That said commission appointed and contracted with two competent disinterested surveyors, W. H. Nicholson and D. V. Reaves, who ascertained and settled all necessary questions as to area of said proposed new county and of the old counties, and filed their report, with a plat of their work, with said commission, as required by said act, stating therein that the line between the old counties of Aiken and Barnwell passed through the incorporated limits of the town of Ellenton, and that the area of the proposed new county was four hundred and five square miles.

5. "That said commission, on the 22d day of November, 1910, duly filed their report and that of said surveyors, together with said plat, in the office of his Excellency, Governor M. F. Ansel, and thereafter said surveyors filed separate affidavits with him, declaring that at the time of making said report they had never seen the act incorporating the town of Ellenton, and that since inspecting it the said Nicholson was unable to say whether said line between Aiken and Barnwell counties passed through said town of Ellenton or not, while said Reaves averred that it did not.

6. "Thereupon, on December 29, 1910, his Excellency, Governor M. F. Ansel, had a hearing, and, after the introduction of evidence by both sides and full argument, found

that said line did not pass through said town of Ellenton, and that all constitutional requirements prerequisite to the ordering of an election upon the question of forming said new county had been complied with as set forth in his order of January 3, 1911, included in the order of Governor Blease, hereto attached, marked Exhibit 'D,' as a part of this petition.

7. "That thereafter, on January 7, 1911, his Excellency, Governor M. F. Ansel, issued his proclamation, calling for an election upon said question to be held on the 7th day of February, 1911, a copy of which proclamation is hereto attached, marked Exhibit 'A,' as a part of this petition.

8. "That pursuant to said proclamation managers of election were duly appointed for the counties of Aiken and Edgefield.

9. "That thereafter, on January 27, 1911, the attorneys for those opposed to the formation of said new county, who had been of counsel in the said hearing before his Excellency, Governor Ansel, moved before his successor, Governor Cole L. Blease, to vacate and annul the said order and proclamation of election of Governor Ansel upon grounds set forth in the motion hereto attached as Exhibit 'B,' as a part of this petition.

10. "Upon hearing said motion his Excellency, Governor Blease, passed an order, hereto attached, marked Exhibit 'C,' purporting to vacate and annul the order of election aforesaid.

11. "Your relators respectfully submit that the said order of his Excellency, Governor Blease, is null and void upon the following grounds, all of which were urged by them at the hearing before him, to wit:

"(a) Because his Excellency, Governor Blease, was without authority or jurisdiction to entertain said motion or to vacate and annul said order for election for the reason that Governor Ansel's findings and order were conclusive as to

the compliance with all constitutional requirements, and rendered all such questions *res adjudicata.*

"(aa) Because the charter of Ellenton shows it to be a square containing a half-mile of area.

"(b) Because even if it be true that the line between Aiken and Barnwell counties passes through Ellenton, as claimed, this would not be a violation of the Constitution, since it appears in the petition for the new county, and in the surveyors' and commissioners' report, that such line was not established by the surveyors as a line of the new county, but was the ancient and existing line already established between Aiken and Barnwell counties, and was merely adopted as one of the boundaries of the proposed new county in the petition therefor on file in the governor's office.

"(c) Because it does not appear that there was any diligence used in procuring the alleged after discovered evidence, upon which the motion was based, in time for the hearing before Governor Ansel, but, on the contrary, it appears that the alleged fraud, deficiency in area, and situation of the town of Ellenton, might have been discovered equally as well before said hearing as afterwards by the exercise of proper diligence.

"(d) Because the alleged fraudulent acts set forth as another ground of the motion do not, in law, constitute fraud.

"(e) Because the findings of fact of the commission, and surveyors' finding on the question of area, is conclusive and cannot be collaterally attacked.

12. "Relators allege that respondents clearly manifest a determination to disobey the order of his Excellency, Governor Ansel, and refuse to comply with the same, and unless this honorable Court intervenes the said boards of registration of Aiken and Edgefield counties announce that they will not deliver the books of registration to the said com-

missioners of election, but will open the same on the first Monday in February in violation of law requiring them to be closed at least thirty days before any special election; and relators aver that if this is done irreparable damage will be done, in that many persons will register and vote in the election to be held the next day who are not qualified to vote therein, and it will be impossible in so short a time for relators to properly inspect the registration list and prepare to resist the casting of any illegal votes.

13. "That unless this honorable Court intervenes the said commissioners of election announce their intention not to turn over said books of registration and election boxes to the managers appointed to conduct said election, and it will be impossible, therefore, for a legal election to be held in accordance with the said proclamation.

14. "Relators allege that the sole duty now devolving upon said boards of registration and commissioners of election is the ministerial one of complying with said order of election; that relators have a legal right to have the election held, and that they have no other adequate and sufficient remedy than as herein prayed.

"Wherefore, relators pray:

1. "That a writ of injunction do issue from this honorable Court, requiring and commanding the boards of registration to keep said books of registration closed on the first Monday in February, and deliver the same to the said commissioners of election.

2. "That a writ of mandamus do issue from this honorable Court, requiring and commanding the said respondents constituting the commissioners of election to deliver said books and the necessary ballot boxes to the duly appointed managers of election, and to do all other things required by law for the holding of the election upon the formation of the proposed new county in compliance with the said proclamation of his Excellency, Governor M. F. Ansel, and

for such and other further relief as to the Court may seem equitable.                              GEO. T. JACKSON,
                                R. H. WELCH,
                                Relators' Attorneys."

EXHIBIT "A."

"State of South Carolina, Executive Department.

"Whereas, A petition was filed in my office on the seventeenth day of May, nineteen hundred and ten, signed by more than one-third of the qualified electors of that portion of Aiken and Edgefield counties living within the boundary of the lines of the proposed new county, hereinafter set out, asking to be allowed to vote upon the question of the formation of a new county covering the territory therein set out, and which original petition has been twice amended, the last amendment allowed by me being on the fifth of November, nineteen hundred and ten, and the territory now sought to be embraced in the proposed new county is as follows, to wit:

"Beginning at a point in the middle of the Savannah River just above the mouth of Dorton's Creek, and about three-fourths of a mile above the western boundary line of Washington township in Edgefield county; thence a straight line to the intersection of the said township line and Big Steven's Creek at or near Parksville bridge; thence down the run of said Big Steven's Creek with its various courses, for a distance of thirty thousand feet; thence a straight line S. 74 E. a distance of thirty-three thousand feet, crossing the Martin town road near Collier's; thence a straight line S. 36 E. a distance of two thousand two hundred feet; thence a straight line S. 50 E. to the division line between Edgefield and Aiken counties; thence up and along said division line to the point of its intersection with the line as passing within two hundred feet of a circle, with Edgefield Courthouse as its center and a radius of eight miles; thence adopting said line and continuing to a point thirteen

thousand five hundred feet east of Little Horse Creek near the head of Sage's Mill branch; thence S. 26 W. eight thousand feet; thence S. 20 W. five thousand feet; thence S. 12 W. five thousand feet; thence S. 6 W. five thousand feet; thence S. 84 W. eleven hundred feet; thence south five thousand feet; thence S. 12 E. five thousand feet; thence S. 12 E. three thousand five hundred feet to the Graniteville road; thence along said road with its various courses five thousand seven hundred and twenty feet; thence S. 16 W. five hundred and ninety-five feet; thence S. 29.30 W. seven thousand feet; thence S. 85.30 W. three thousand feet, crossing Clear Water pond; thence S. 22.30 W. twenty-six hundred and fifty feet; thence S. 4.30 W. twenty-two hundred feet; thence S. 13.30 W. two hundred feet; thence S. 18.30 W. three hundred fifty-five feet to the Hamburg and Barnwell road; thence along said road with its various courses to its intersection with the Pine Log road; thence along said Pine Log road with its various courses for a distance of fifteen hundred feet; thence a straight line S. 87.30 E. a distance of eight thousand five hundred feet; thence N. 76.30 E. a distance of seven thousand nine hundred feet; passing to the right of the McElmee's chalk bed and to the left of Smith's house; thence a straight line for a distance of fourteen thousand five hundred feet, crossing Towns Creek, and at its nearest point forty-two thousand four hundred and fifty feet from Aiken Courthouse building; thence a straight line to its intersection with Silver Bluff road to a point forty-two thousand four hundred and forty feet from said Aiken Courthouse building; thence the said Silver Bluff road with its various courses for a distance of seven thousand five hundred feet; thence a straight line S. 61 E. a distance of seven thousand five hundred feet; passing between Padgett's house on the right and Harden's house on the left, and crossing Hollow Creek at a point about five hundred feet south of McElmee's mill; thence a straight line N. 88 E. a distance of five hundred feet; thence a straight

line S. 78 E. a distance of three thousand two hundred feet; thence a straight line S. 46 E. a distance of four thousand five hundred feet, and passing the house of Ezekiel Boyd to the right; thence a straight line S. 25.30 E. a distance of ten thousand five hundred feet, passing the house of Butler Boyd to the right; thence a straight line S. 1.30 W. a distance of six thousand five hundred feet, passing the houses of George Tool, Robert Key and W. T. Green to the right; thence a straight line S. 56 E. a distance of seven thousand two hundred and fifty feet, passing the houses of Eddy Boyd and Jacob Widener to the right; thence a straight line S. 39 E. a distance of eight thousand feet, passing the houses of Ben Boyd and Fred Tool, and Hamp Weidner to the right; thence a straight line S. 6 E. a distance of twelve hundred feet; thence a straight line S. 14 E. to its intersection with an old public road, passing the houses of W. H. Beauford to the right; thence along said old public road with its various courses for a distance of three thousand six hundred feet; thence a straight line N. 65 E. a distance of thirty-eight hundred feet, passing the house of R. E. Stallings to the right; thence N. 50 E. a distance of four thousand five hundred feet, passing the houses of Andrew Eubanks, Ben Key and Eldridge Toole to the right; thence a straight line N. 30 E. to its intersection with the said Hamburg and Barnwell road, near Treadway bridge, and passing the house of Maxey Toole to the right, and the house of B. R. Green to the left; thence along said road with its various courses to its intersection with Tinker Creek; thence down said Tinker Creek with its various courses to its intersection wth Kennedy's Mill Creek, thence up the said Kennedy's Mill Creek with its various courses to its intersection with the Barnwell county line; thence the said Barnwell county line, the line to the middle of the Savannah River; thence the median line of the Savannah River, the line to the beginning point.'

"And whereas, Commissioners were appointed as required by the Act of 1905 to ascertain and report upon the allegations of the petition and to employ surveyors to make a survey and a map of the proposed new county, which surveyors made a map of the territory and filed the same with the said commissioners, which was filed in my office and which contains and embraces the territory above set forth;

"And whereas, It appears to my satisfaction that the boundaries of the proposed new county, the number of inhabitants, the taxable property, and the proposed lines do not run nearer than eight miles to any courthouse building now established by law;

"And whereas, From the report submitted to me by said commission, as provided for in the Act of 1905, I am satisfied that the requirements of the Constitution as to area, distance, wealth, population, etc., have been complied with, and that the number of square miles in the proposed new county to be formed from Edgefield and Aiken counties, is four hundred and five square miles and that there is left in the old county of Aiken eight hundred and twenty square miles of area, and in the old county of Edgefield five hundred and one square miles of area;

"Now, therefore, I, M. F. Ansel, as Governor of the State of South Carolina, by virtue of the power conferred upon me by the Constitution and laws of this State, do hereby order that an election be held in the territory embraced within the proposed new county on the 7th day of February, A. D. nineteen hundred and eleven, upon the question of creating the said new county, and that at such election the qualified electors within the proposed area shall be allowed to vote upon said question; those favoring the proposed new county to vote 'Yes,' and those opposing 'No.'

"That the commissioners of State and county elections of the counties of Aiken and Edgefield shall make all necessary arrangements for holding said election, shall appoint

managers and do all other things necessary for the holding of said election, that the county supervisor of each of said counties of Aiken and Edgefield, shall have prepared printed tickets and furnish same to the commissioners of election of each of said counties to be sent out to the managers of said election for the use of the voters.

"That at the said elections, the question of the name of such county and also the county seat, shall be submitted to the said qualified electors.

"That said election shall be held under the same rules and regulations as are provided by law for regular county elections, that the managers shall be sworn before entering upon the discharge of their duties and shall open the polls at seven o'clock in the morning and keep the same open until four o'clock in the afternoon, when the polls shall be closed, the votes counted, a return of the number of votes polled for or against, signed and certified to by the managers of election, which, together with the ballot box, ballots and poll list, shall be turned over to the commissioners of election of Aiken and of Edgefield counties, as required by law, that the commissioners of election shall then, as now required by law, tabulate the vote and make returns thereof to the Governor of the State and to the Secretary of the State, and file a copy of the same in the office of the Clerk of Court of Common Pleas for the said county of Aiken and for the said county of Edgefield, respectively.

"In testimony thereof, I have hereunto set my hand and caused the great seal of the State to be affixed at Columbia, S. C., this 7th day of January, in the year of our Lord one thousand nine hundred and eleven, and in the independence of the United States of America the one hundred and thirty-fifth.          (Signed)    M. F. ANSEL, Governor.

By the Governor:

(Signed) R. M. McCOWN, Secretary of State."

EXHIBIT "B."

"State of South Carolina, County of Aiken.

"*In re* petition for new county from Aiken and Edgefield counties along the Savannah River.

### Notice of Motion.

"To Messrs. R. H. Welch and George T. Jackson, Attorneys of Petitioners:

"Please to take notice, that on the 27th day of January, 1911, at 11 o'clock a. m. of said day, or as soon thereafter as counsel can be heard, at his office in the State House at Columbia, S. C., we will move his Excellency, the Honorable Cole L. Blease, Governor of the State of South Carolina, for an order annulling and vacating the order of his predecessor, the Honorable M. F. Ansel, dated the 7th day of January, 1911, ordering a new county election in the territory set forth in his proclamation; said motion will be based upon the petition, plats, documents, affidavits and all other testimony, oral and documentary, that were before the Honorable M. F. Ansel at said hearing, and also upon the affidavits, copies of which are herewith served upon you and are hereto attached, and a list of said affidavits is attached thereto, also oral testimony bearing thereon.

"We will submit to his Excellency, Governor Blease, that he should vacate said order and pass an order dismissing the petitions and refusing to allow an election to the petitioners, because of additional testimony presented to him, which is after discovered testimony, and will establish the fact that Governor Ansel acted under a mistake as to the acreage of the proposed new county, which mistake was brought about by the promoters of the new county; and that he made a mistake as to his finding of fact concerning the area of the town of Ellenton, and because the important testimony now produced in addition to what he had before him, we submit clearly establishes that the corporate limits of the town of Ellenton is contained in a square mile and not half a mile

square, and that the line of the proposed new county passes through the corporate limits of the town of Ellenton; and that further the testimony submitted shows that D. V. Reaves, acting as the agent of the promoters of the new county perpetrated a fraud upon the citizens of the county by the manner in which he got up the line in forming the line of the proposed new county and in separating the voters from their property and in leaving the proposed new county in an unsightly shape, and also the line of the old county in the same shape.

"We will make this motion in behalf of E. R. Buckingham, R. B. Weeks and others, who as electors, filed a caveat to the petition in this matter before Governor Ansel; and in addition thereto we will make this motion in behalf of P. Butler Glover, Frank Owens, J. A. Stokes, John D. Brown and S. B. Weeks and numerous other electors and taxpayers within the area of the proposed new county; and also in behalf of T. J. Cheeks, F. E. Henderson, Benjamin McCormick, John R. Eidson, J. D. Harris, John G. Chafee, F. E. Cortez, B. F. Holley and many others, electors and taxpayers, within the territory of the county of Aiken.

"Respectfully,          D. S. Henderson,
                        P. F. Henderson,
                        W. Q. Davis,
                        C. E. Sawyer,
                        T. G. Croft."

Exhibit "C."

"State of South Carolina, Executive Department.

"In the matter of the proposed new county to be formed from Edgefield and Aiken counties.

" 'On the 3d day of January, 1911, the Governor of the State of South Carolina, the Honorable M. F. Ansel, signed an order in this matter, which is as follows:

" 'Since the coming in of the report of the commissioners appointed by me in this matter, the question has arisen

as to whether the town of Ellenton is entirely in the county of Aiken or partly in Aiken and partly in Barnwell.

" 'The charter of the town granted by the legislature in 1880 has been produced and much evidence by affidavit and parole has been introduced, and considered by me. · Expert evidence has also been introduced as to the proper construction of the charter, that is, whether the wording of the charter made the limits of the town embrace one mile square or one-half mile square.

" 'The case has been ably argued before me by the counsel in the case.

" 'The question is an important one, for if the town embraces the one square mile then the line of the proposed new county would pass through an incorporated town, otherwise not.

" 'After giving the matter much thought, and considering the authorities that have been cited, and the evidence adduced, I have come to the conclusion that the limits of the town of Ellenton do not embrace the area of one mile square, but one-half mile, and that consequently the line of the proposed new county does not run through an incorporated town.

" 'The other facts necessary to entitle the people in the territory to vote upon the proposition having been reported to me by the commission, an order for an election will be made.'

"Said order was followed up by an executive proclamation calling an election at the precincts in the territory of the proposed new county on the 7th day of February, 1911.

"On the 23d day of January, I was notified by the attorneys of E. R. Buckingham and others, electors in the county of Aiken, some of whom had filed a caveat before Governor Ansel that they objected to the formation of the said new county, that they intended to move before me on four days' notice to the attorneys of the petitioners for the new county who had appeared before Governor Ansel, and I

agreed to designate Friday the 27th day of January, 1911, for such hearing. It appears that said four days' notice was given.

"The motion papers pray for an order annulling the aforesaid order of Governor Ansel and that I should pass an order dismissing the petition and refusing to allow an election as to the said proposed new county. The matter has been carefully considered. In the case of *Lamar* v. *Croft,* 73 S. C., page 412, after grave consideration our Supreme Court enunciated the doctrine as follows: 'Our construction of section 1, article 7 of the Constitution, is that it imposes exclusively upon the governor the duty of determining whether there has been a compliance with the requirements of the said Constitution preparatory to the ordering of an election, and that the Courts have not the power to interfere with him in the exercise of his discretion.' This doctrine so enunciated by our highest Court and which declares that the governor of the State has exclusive jurisdiction under the article of the Constitution concerning new counties to pass upon the question and finally determine whether the constitutional prerequisites for ordering an election has been several times recognized and declared.

 *Reese* v. *Ansel, Governor,* 78 S. C. 331.

 *Parler* v. *Fogel,* 78 S. C. 572.

"The Supreme Court in the case of the *State* v. *Ansel,* 76 S. C., page 412, known generally as the Rawlinson Case, has decided that they could not *certiorari* the record of the governor after examination, even on questions of law, to say nothing of questions of fact (which cannot be carried up in that way), when the governor had been proceeding under a duty imposed upon him by the Constitution. From this enunciation of the Supreme Court, which appears to me to be clear and beyond cavil, it is claimed by those who represent the opponents of this proposed new county, that they could not appeal to the Courts either by appeal from

the order of Governor Ansel or in any other way either by *certiorari* or for an injunction even if an intentional wrong had been done them when he ordered the election as aforesaid, and that having no remedy in any other forum than before the governor of the State, they appealed to me as such governor. It appears to me beyond question that this postion is correctly taken.

"This being so, I am brought fairly up to the inquiry whether, as the successor of Governor Ansel, for any reason I can review his action in the premises. The governor of a State acts in his official capacity and represents the sovereignty of the State; and the successor of the governor does likewise. It is not the individual who is being reviewed, but it is the action of the governor, and the matter stands in the same attitude where one judge on a new state of facts, according to law, can review the action of another judge and even of the jury. A tribunal which has exclusive jurisdiction to grant orders of election (our Supreme Court has so declared, as shown aforesaid, that the governor of our State possesses said power under the Constitution as to new counties) has the power to look into and to supersede and set aside such former action upon proper principles.

*Wook* v. *Carrington,* 32 American Reports, 350.

*Kentucky* v. *Dennison,* 24 Howard, 66.

*Taylor* v. *Tainton,* 16 Wallace, 366.

Spear on Extradition, page 440.

"The application in this case is upon the grounds of newly discovered testimony, testimony which has been ascertained, it is alleged, since the hearing before Governor Ansel; which could not have been obtained by the exercise of due diligence before said hearing, and which is material to the questions before Governor Ansel. In hearings before an executive who is given quasi-judicial power as it seems to have been given in this State in matters of new counties, the strict rule of procedure and practice in Courts need not

be followed, but following the well settled doctrine of our Courts as to the granting of a hearing on the ground of newly discovered evidence and exercising that discretion which the Supreme Court declares is given to judges to grant or refuse a motion for the new hearing on the ground of newly discovered testimony, I am convinced that in this case the dispensing of simple justice and the granting of the inherent right of the people to be heard on such a grave question as this, requires me to reconsider the action of my predecessor in office and to pass upon the question of whether or not an election should proceed in the territory of the proposed new county. The rule, as laid down by our Supreme Court, as to the granting of new hearings, on the ground of after discovered testimony is to be found in the recent case of *Mills* v. *Atlantic Coast Line,* 87 S. C. 157, where all the authorities are collected, and is strongly stated also in the *State* v. *Nance,* 25 S. C. 174.

"So then, exercising the discretion allowed me in such matters, after due consideration of the showing made and the testimony tendered, I concluded that it is my duty to rehear the entire matter.

"The establishment of this proposed new county is contested on several grounds:

1. "That the line between Barnwell and Aiken counties sought to be established as the line of the new county passes through the incorporated town of Ellenton, and that the same is inhibited by section 14, article VII of the Constitution, which distinctly declares that 'hereafter no county lines shall be so established as to pass through any incorporated city or town of this State.' The testimony taken before Governor Ansel and the newly discovered testimony presented to me, shows clearly to my mind that the limits of the incorporated town of Ellenton (which was simply denominated in its charter, granted in 1880, as Ellenton, in the county of Aiken, for purposes of business and residence) embraces the area of one mile square, and that the

Aiken and Barnwell county line, which it is sought to establish as a line of the proposed new county, runs through said limits of said town of Ellenton, and I so find, as matter of fact and so finding, as matter of law, it is clear to sustain a county where it is sought to establish such a line would be to sustain the establishment of an unconstitutional county. The old surveyor, Major Crosland, who laid out the town of Ellenton is dead, but his notes of survey were produced made at the time; and since the hearing before Governor Ansel, the ground has been run out according to those notes and the corners established by the old surveyor have been ascertained according to the witness trees which he marked. Besides that, to reduce the town of Ellenton to a half-mile square, as is claimed by the advocates of the new county, would be to take away from that municipal corporation territory which has paid taxes to the town council and would take away from such territory the police protection of said council. These are some of the considerations which impel me to make the finding of fact that the lines sought to be established as a new county line passes through the limits of the municipality of Ellenton, and hence that an election cannot be ordered for such new county.

"The second ground upon which the establishment of this new county is resisted is that whilst the surveyors report that the area of the proposed new county is four hundred and five (405) square miles, in fact the plat reported by them to the governor does not show any such area, and that this requirement of the Constitution is not complied with. The surveyors report that Edgefield county is reduced to five hundred and one (501) square miles and Aiken county to some eight hundred (800) square miles, and that the proposed new county has four hundred and five (405) square miles. The plat of the surveyors and their report and the report of the commissioners under the Act of 1905, made to Governor Ansel, contain these state-

ments and they are set forth in his proclamation. Those who object to the new county on this ground, did not make any question before him on this ground, no doubt and as they claim, because they were misled by the plat and the report of the surveyors and the report of the commissioners. But as was decided in the case of *Reese* v. *Ansel,* 78 S. C. 331, the governor is not bound by the report of the surveyors or the commissioners and, as really this mistake appears from a proper inspection of the map presented to the executive department, it can be looked into just like a Court can look into a mistake made by itself, and especially so when that mistake is brought about to a great extent by the representations of the promoters of the new county. After careful consideration from the testimony of the witnesses, produced by the opponents of the new county, civil engineers and others, not only ordinary surveyors, but men who are high in the profession of civil engineering, I am convinced that the area of the propossd new county, as laid out on a plat, which should be the foundation for all time to come as to where the new county lines should stand, does not embrace the requirement of the Constitution that there should be four hundred (400) square miles in the county. See section 3, article VII, of the Constitution. In this connection, it should be borne in mind that in section 2, article VII, of the Constitution, it is declared that 'no county shall be formed without complying with *all* the conditions imposed in this article.'

"Those who seek the establishment of the new county must show that all the constitutional requirements have been complied with. I, therefore, find as a matter of fact that this requirement of the Constitution as to area has not been complied with.

"The next position urged for the refusal of an election for this new county is, that in the preliminary establishment of the lines, for the purpose of petitioning the governor for an election, the surveyor who represented the promoters of

the new county practically practiced a fraud upon the people of the county of Aiken along the proposed border lines, by ascertaining first their position as for or against the new county, and then running the lines, no matter what inconvenience would follow as to cut out voters who were against the new county and leave most of their property for taxable purposes inside the new county; in one affidavit it was testified that this surveyor, a Mr. Reaves, ran the line between the house of the voter and the well from which his family got drinking water. The evidence satisfies me that this plan was systematically carried on and exercised by this surveyor as the policy of the promoters. It is true the Constitution does not lay down the form of a new county or the manner in which the lines shall be run, but the spirit of the Constitution certainly means justice to all people concerned, and such practice as is shown in this case ought not to be encouraged by the executive department, upon whom the duty of passing upon Constitutional requirements of a new county is placed by the Constitution, as is enunciated by a decision of our higher Court, the Supreme Court of South Carolina. I am and have always been in favor of new counties, but I do not believe that it will be conducive to the welfare of the people of the State that new counties should be established which have such irregular shapes as the one that is proposed in this case, and a reference to the map thereof filed in this office will show its condition.

"Upon the whole matter, and after most careful consideration thereof, and in the exercise of the discretion imposed upon me by the Constitution, it is ordered and adjudged that the proclamation of his Excellency, the Governor of South Carolina, calling an election to be held for this county from portions of Edgefield and Aiken counties on the 7th day of February, 1911, be, and the same is hereby, revoked and the prayer of the petitioners for an election in such territory be, and is hereby, denied and the petitions dismissed. A proclamation to this effect will be

issued and orders to the commissioners of State and county elections for the counties of Edgefield and Aiken, stopping the holding of said elections, will be issued.

"I feel satisfied that had the testimony which has been produced before me as additional testimony to that which was before his Excellency, Governor Ansel, been before him, he would never have ordered an election in this matter, and I take pleasure in so stating.

(Signed) COLE. L. BLEASE,
Governor."

*Messrs. Geo. T. Jackson* and *R. H. Welch,* for petitioners.

February 3, 1911.   PER CURIAM.   Upon the petition and exhibits herewith to be reported the Court is asked to issue a rule to show cause why the mandamus and injunction prayed for should not be granted.

After consideration the Court is of the opinion that the petition and exhibits do not present a *prima facie* case for the petitioners and hence that the application for a rule to show cause should be denied and the petition dismissed.

It appears that Governor Martin F. Ansel, on January 3, 1911, ordered an election to be held on February 7, 1911, on the question of establishing a new county out of portions of Edgefield and Aiken counties, and this proceeding is intended to compel the proper officers to proceed to make necessary arrangements to hold said election, as ordered by Governor Ansel.

It also appears that Governor Cole L. Blease, after he became governor, was called upon to review the action of Governor Ansel, and reconsider the question whether all constitutional requirements essential to the ordering of such an election had been met, which resulted in an order of Governor Blease, made January 27, 1911, annulling the order of election made by Governor Ansel.

It is manifest that the petitioners' case depends upon their claim that Governor Blease had no power to review and vacate the action of Governor Ansel in the premises. We hold that Governor Blease had such power. It was held in *State* v. *Ansel*, 78 S. C. 333, 58 S. E. 933, that the governor has such power of review or reconsideration certainly before an election has been ordered. We now hold that even after ordering an election the governor ordering the election or a succeeding governor has authority to reconconsider the matter and, upon a satisfactory showing that some constitutional requirement has not been complied with or met, he may vacate the order of election, certainly if no private or property right will be thereby destroyed, which does not appear to be the case in this instance.

The Constitution, section 1, article VII, imposes exclusively upon the governor the duty of determining whether there has been a compliance with the requirements of the Constitution preparatory to the ordering of an election and the Courts have not the wish or power to interfere with him in the exercise of executive prerogative or discretion. *Lamar* v. *Croft*, 73 S. C. 412, 53 S. E. 540.

The election ordered having been vacated by proper authority, the respondent officers have no duty to perform in reference thereto, and hence no case is made against them for injunction or mandamus.