9376

ROBINSON *ET AL.* v. McGOWN *ET AL.*

(88 S. E. 807.)

1. COUNTIES — FORMATION OF NEW COUNTIES — REDUCING AREA — "OLD COUNTY."—Const., art. VII, sec. 4, forbidding in the creation of new counties the reduction of "old counties" to a less area than 500 square miles, does not forbid the reduction below 500 square miles of counties created since the Constitution was adopted; the words "old county" being used to designate only counties then existing.

2. COUNTIES — FORMATION OF NEW COUNTIES — SECOND ELECTION.—An attempted election as to formation of a new county, set aside as void, does not bar another election on the same question a year later, under Const., art. VII, sec. 2, that "an election upon the question of forming the same proposed new county shall not be held oftener than once in four years;" for, while the first election was originally merely voidable, it became, by Court action, null and void, and hence no election at all.

3. COUNTIES—NEW COUNTIES—SUBMISSION TO VOTERS.—Under Civ. Code 1912, sec. 640, as to proceedings to form a new county, providing that

within 20 days after receiving the commissioner's report the Governor shall order an election held in 60 days in the territory to be cut off, it cannot be objected to the validity of a second election after a first election so ordered and held has been set aside as void that the later election necessarily is not ordered and held within the time specified; as the statute is directory merely, to insure a reasonably early election.

In the Original Jurisdiction.　　January, 1916.　Petition dismissed.

Application for *certiorari* by T. A. Robinson and others against R. M. McCown and others to determine the validity of election proceedings.

*Messrs. Grier, Park & Nicholson* and *Wm. N. Graydon,* for petitioners, cite: *As to meaning of "old county:"* 93 S. C. 217. *Legislative construction:* Civil Code, secs. 634, 637, 639, 641, 642. *Second election within four years:* Const., art. VII, sec. 2; 79 S. C. 414; 102 S. C. 255. *Order for election:* Const., art. VII, sec. 1.

*Mr. R. H. Welch,* for respondents, reviews 93 S. C. 217, and submits: *That where the provisions of the Constitution are doubtful, or its meaning not clear, the proceedings and debates of the constitutional convention are valuable aids in determining the purpose, intent and consequent meaning of any parts thereof, including articles, sections, phrases and words:* 196 U. S. 19; 141 U. S. 468; 143 U. S. 457; 173 U. S. 65; 182 U. S. 244; 19 W. Va. 420; 52 Wis. 37; 26 Wend. (N. Y.) 599; 2 Hill (N. Y.) 31; 24 N. Y. 485; 53 Mich. 481; 51 Am. Rep. 95; 4 Cal. 54; 60 Am. Dec. 581; 84 Ill. 643; 91 Ky. 6; 24 Neb. 586; 5 Nev. 399; 11 Wend. (N. Y.) 518; 21 N. Y. 13. And further cites: *As to definition of "old" and "new" county:* 87 Tex. 475; 23 S. E. 311-2; 61 S. E. 1021; Sneed 490. *Second election within four years:* Const., art. VII, sec. 2; Civil Code, 644, 641; 102

S. C. 255. *Void and voidable elections:* 72 S. W. 65; 29
Fla. 229, 272; 92 Minn. 429; 100 N. W. 101; 7 Col. App.
243; 42 Pac. 1041; 60 W. Va. 594; 55 S. E. 599; 29 W. Va.
63; 13 Am. Dec. 408; 70 Am. Dec. 491; 22 Am. Rep. 689;
26 N. H. 232-237; 40 Cyc. 216; 31 S. C. L. (2 Rich.) 209;
33 S. C. Eq. (10 Rich.) 551; 101 S. C. 293; 43 Atl. 576;
10 Ohio St. 532; 78 S. C. 469. *Governor's order:* Const.,
art. VII, sec. 1; 73 S. C. 412. *Procedure necessary in for-
mation of new county:* Civil Code 1912, secs. 635, 636, 637,
638, 639, 640; 24 Stats. 916, sec. 3; 22 Stats. 64; Civil Code
of 1902, sec. 575. *Variance, and effect of codification in
1912;* Const., art. VI, sec. 5. Also cites: *Journal of con-
stitutional convention of 1895, pp. 44, 45, 88, 124, 173, 184,
218, 246, 256, and the newspaper reports of proceedings of
the convention in News and Courier, State, and Register, of
October 21, 22, 23, 24, 1895.*

The Circuit Judges having been called to the assistance
of the Supreme Court.

April 12, 1916.
The opinion of the Court *en banc* was delivered by MR.
JUSTICE HYDRICK.

In the fall of 1914 a petition was filed with the Governor
praying for an election on the question of creating a new
county out of portions of Abbeville, Edgefield, and Green-
wood. In accordance with the provisions of the statutes
(section 636, *et seq.*, vol. I, Code 1912), a commission was
appointed, and, upon the filing of the report of the commis-
sion that the provisions of the Constitution and statutes
relating to the formation of new counties had been complied
with, an election was ordered to be held on December 29,
1914. That election was held, and, on the face of the
returns, the result was in favor of the new county; but the
election was contested on the ground, among others, that
qualified electors residing in certain parts of Greenwood,

which it was proposed to incorporate into the new county, had been denied the right to vote in the election by the failure of the election officers to open the polls at the voting places, or precincts, for which they were registered, and that there was a sufficient number of such electors to have changed the result.    Upon that ground the election was held to be void.    *Callison* v. *Peeples,* 102 S. C. 255, 86 S. E. 635. Within a reasonable time after the filing of the decision of this Court holding the election null and void the Governor ordered another election on the same question to be held on December 14, 1915.    This order was based upon the same petition, record, and report of the commissioners as the previous order.    The election was held, and the result was declared to be in favor of the new county, notwithstanding it was contested on the same grounds upon which it sought in this proceeding to have it set aside, to wit:

(1) In the creation of the new county the area of Greenwood has been reduced below 500 square miles.    Section 4 of article VII of the Constitution provides that in the creation of new counties "no old county shall be reduced to less area than five hundred square miles," etc.    In *Rhame* v. *DuRant,* 93 S. C. 217, 76 S. E. 611, I considered the provisions of article VII of the Constitution, and reached the conclusion that the words "old county," in section 4, above quoted, were used by the framers of the Constitution to designate the then existing counties, and that a county thereafter created, as Greenwood was, is not an "old county" within the meaning of those words as used in section 4.    Upon further consideration of the question, in the light of the debates in the constitutional convention on the adoption of the provisions of article VII, I entertain no doubt of the correctness of that conclusion.    The reasons upon which my decision is rested are fully set forth in the opinion in that case, and need not be repeated here.

(2) The last sentence of section 2 of article VII reads: "An election upon the question of forming the same proposed new county shall not be held oftener than once in four years."

It is contended that the election of December 14, 1915, was in violation of this provision, because it was within four years of the previous. election. That contention would be sound if the election of 1914 had not been contested and set aside. But it was adjudged to be null and void. Therefore it was no election. By the terms of the Constitution the intention as clearly appears that, on compliance with the specified conditions, the people interested should have the right to an election on the question of creating the new county as that they should not be annoyed by the agitation of that question oftener than once in four years. They complied with the conditions. They were entitled to an election. The opponents of the new county contended that the election of 1914 was no election. The Court sustained that contention. The judgment was that the election was null and void. That means, if it means anything, that there was no election. Now they say it was an election, and, because it was, another election could not lawfully be held until after the lapse of four years from the date of the first. The bare statement of the contention shows its fallacy.

It is argued, however, that the first election was not void, but only voidable, and we are asked, upon this technical distinction, to hold that the first election was a bar to the second. The distinction between void and voidable is well understood, and it is recognized in our decisions for some purposes and in some circumstances. See *State* v. *Smith,* 101 S. C. 293, 85 S. E. 958. No doubt, if the first election had not been contested and set aside, it would have been a bar to the second. But that does not impair in the least the rule that, when that which is voidable has been adjudged to be void as to all parties interested, it is, as to all rights or interests thereafter based upon it, as if it never existed.

19—104

From that time on no rights can be predicated upon it, nor can it serve as the basis for the denial of any right. This view is in accord with sound reason, and it is sustained by the following decisions of other Courts: In *McKinney* v. *Commissioners,* 26 Fla. 267, 4 South. 855, it was held that, where a bill seeks to enjoin a second election on the question of changing the location of a county seat, on the ground that it was within the time prescribed by statute regulating the subject, the bill must show that the first election was legal. In *Gile* v. *Stegner,* 92 Minn. 429, 100 N. W. 101, the same question arose under a statute which limited the right to resubmit the question to popular election until the lapse of four years from the date of the first election. An election on the question had been held to be invalid. The Court said:

"If it had been the intention of the legislature to include within the purview of the limitation attempted elections which were absolute nullities, it is presumed that it would have said so."

To the same effect see *Coleman* v. *People,* 7 Colo. App. 243, 42 Pac. 1041, and *Chambers* v. *Cline,* 60 W. Va. 588, 55 S. E. 999.

So that, though it be conceded that the first election was only voidable, since it has been adjudged to be void, it cannot have the effect of barring the second election.

(3) The next and last contention of the petitioners is based upon section 640, vol. I, Code 1912, which provides:

"Within twenty days after receipt of the report of the commission, the Governor shall order an election in the territory proposed to be cut off for the new county to be held within sixty days from the date of the order," etc.

The first election was ordered and held within the times specified. The second was not, and could not have been, under the circumstances. But this was not of the substance and did not vitiate the election, because the statute is merely

directory; the purpose being to have the issue raised by the petition disposed of at a reasonably early time after the filing of the report. Ordinarily the time fixed by law for the holding of an election, whether it be fixed by statute or by one who is authorized by law to appoint the time, is mandatory and of the substance. But this rule is not inflexible, and elections held at other times have been sustained. This case, however, is not within that rule or its reason. The election was held at the time fixed by the order of the Governor. The time within which the order for an election shall be made is a different matter, and the effect of a variance from it rests upon different considerations. The prevailing intent of the lawmakers was that an election should be ordered and held. The specification of the time within which it should be done was of secondary consideration, and was intended not to limit the power, but to insure its timely exercise. 9 R. C. L. 998, 999; *State v. South Kingstown,* 18 R. I. 258, 27 Atl. 599, 22 L. R. A. 62, 71.

Petition dismissed.

MR. ASSOCIATE JUSTICE FRASER and CIRCUIT JUDGES PRINCE, SHIPP, SEASE, RICE, BOWMAN, MAULDIN, SMITH, and PEURIFOY, concur in the opinion of the Court.

MR. CHIEF JUSTICE GARY, *dissenting.* This is an application to the Court, in the exercise of its original jurisdiction, for a writ of *certiorari* for the purpose of determining the validity of the election held on the 14th of December, 1915, on the question of creating a new county from portions of the counties of Abbeville, Edgefield, and Greenwood. The result was declared to be in favor of the new county, and at the last session of the legislature an act was passed creating such new county, but subject to the decision of the Supreme Court in this proceeding, which was then pending. In 1914 there was a similar election, which upon the face of the returns appeared to be in favor of the creation of the

new county. That election, however, was contested; one of the grounds being that qualified electors residing in a portion of Greenwood county, from which it was sought to create the new county, were denied the right to participate in the election on account of the failure of the proper officers to open the polls at certain precincts where they were registered, and that the said electors were sufficient in number to have changed the result.

The first question that will be considered is whether Greenwood county can be reduced below 500 square miles for the purpose of creating the proposed new county. Our views upon this question are fully stated in the case of *Rhame* v. *DuRant,* 93 S. C. 217, 76 S. E. 611, and are to the effect that the words "old county" have reference to a county in existence when the Constitution was adopted. As the county of Greenwood was created after the adoption of the Constitution, the provision that no old county shall be reduced to less than 500 square miles has no application.

The next question for determination is whether the Governor was limited to 20 days within which to order the election after the filing of the commissioners' report. The statute is merely directory, and the action of the Governor in this respect is not subject to review by the Courts. *Lamar* v. *Croft,* 73 S. C. 407, 53 S. E. 540; *Fraser* v. *James,* 65 S. C. 78, 43 S. E. 292; *State* v. *Board of Registration,* 87 S. C. 474, 70 S. E. 898.

The last question for consideration is whether the election was ordered and held in violation of section 2, art. VII of the Constitution, which provides that:

"An election upon the question of forming the same proposed new county shall not be held oftener than once in four years."

The question under consideration is dependent upon the meaning of the word "election," as used in the Constitution. The rule laid down in Cooley's Constitutional Limitations,

pp. 73, 74, in reference to the construction of Constitutions, is as follows:

"In interpreting clauses we must presume that words have been employed, in their natural and ordinary meaning, as Marshall, C. J., says: 'The framers of the Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said. This is but saying that no forced or unnatural construction is to be put upon their language. * * * Technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government.' "

An election takes place whenever the electors cast their ballots, under proceedings authorized by law, for the purpose of determining the result upon a question submitted to them, and such result is declared. The object to be accomplished by the said provision is very material in arriving at the sense in which the word "election" is used in the Constitution. There can be no doubt that the intention was that the people within the area of a proposed new county should not be annoyed by elections oftener than once in four years.

MR. JUSTICE HYDRICK says:

"No doubt, if the first election had not been contested and set aside, it would have been a bar to the second. But that does not impair in the lest the rule that, when that which is voidable has been adjudged to be void as to all parties interested, it is, as to all rights or interests thereafter based upon it, as if it never existed."

This is true as a general proposition, but it seems to us that the fallacy in the argument lies in the fact that, when the election was set aside, it was not, as to all rights or interests thereunder, the same as if the election had never been

held, for the reason that such a construction in this case would destroy the rights of the people to be protected from the annoyance attendant upon a subsequent election within four years, as contemplated by the Constitution. The annoyance arising out of an election which is set aside on account of an irregularity in the conduct thereof is just the same as in the case of a valid election. Every step which it is necessary to take in the conduct of a valid election must be taken in one that is afterwards set aside, as the question whether the irregularity is material cannot be determined until it is ascertained by a count of the ballots whether the number of those who were prevented from voting was sufficient to change the result of the election. *Parler* v. *Fogle,* 78 S. C. 570, 59 S. E. 707; *State* v. *Board of Canvassers,* 79 S. C. 414, 60 S. E. 967.

There were many members of the constitutional convention who were not lawyers, and it is unreasonable to suppose that they contemplated the technical distinction between the result of an election caused by a majority of the electors casting their ballots against the creation of a new county and a result brought about by a mere irregularity in the conduct of the election; the distinction being, as contended, that in the first instance there could not be another election within four years, while in the latter event an indefinite number of elections could be held in that period. There were also many lawyers in that convention, yet they did not see fit to provide that an indefinite number of elections might be held within four years if the previous election was set aside on account of an irregularity in the conduct thereof. It is a familiar rule of construction that, whenever a provision in an instrument of writing is susceptible of two interpretations, one of which will defeat its object, while the other will enable it to be carried into effect, the latter construction is to be preferred. If the members of the convention had intended that the word "election" should be used in any other than its ordinary meaning, it is but reasonable

to suppose that they would have added a provision to the effect that said election should not be applicable to elections that were set aside for irregularities. It seems to us, therefore, that any other construction practically interpolates into that section a proviso which the convention did not see fit to adopt. As the convention did not see fit to insert a proviso that the section should not be applicable if the election was set aside, it cannot now be contended that such was its intention, unless there is a resort to the doctrine of implication. It would, however, be unreasonable to imply such an intention, when it would have the effect of giving to the word "election" an unusual meaning, and would defeat the admitted object of the constitutional provision.

In *Norton* v. *Bradham,* 21 S. C. 375, the Court quotes with approval the following language from Cooley's Const. Lim. :

"The people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication."

In the same work, on page 78 (6th ed.), the author says :

"When the means for the exercise of a granted power are given, no other or different means can be implied, as being more effectual or convenient. * * * Another rule of construction is that, when the Constitution defines the circumstances under which a right may be exercised, the specification is an implied prohibition against legislative interference to add to the condition."

In Potter's Dwarris on Statutes the rule is thus laid down :

"That, where the language is explicit, the Court is bound to seek for the intention in the words of the act itself, and they are not at liberty to suppose or to hold that the legislature intended anything different from what their language imports."

In section 4, of Endlich on the Interpretation of Statutes, it is said:

"The legislature must be intended to mean what it has plainly expressed, and consequently there is no room for construction. * * * Where the words of a statute are plainly expressive of an intent not rendered dubious by the context, the interpretation must conform to and carry out that intent. It matters not in such a case what the consequences may be. It has, therefore, been distinctly stated (quoting from Wilberforce on Stat. Law) from early times down to the present day that Judges are not to mold the language of statutes in order to meet an alleged convenience or an alleged equity; are not to be influenced by any notions of hardship, or of what in their view is right and reasonable, or is prejudicial to society; are not to alter clear words, though the legislature may not have intended the consequences of using them; are not to tamper with words for the purpose of giving them a construction which is supposed to be more consonant with justice than their ordinary meaning."

That author also declares that considerations of public policy are not to be considered, quoting the following language of Mr. Justice Story:

"Arguments drawn from impolicy or inconvenience ought here to be of no weight. The only sound principle is to declare it a *lex scripta est,* to follow and obey."

The foregoing are quoted with approval in the case of *Beaty* v. *Richardson,* 56 S. C. 173, 34 S. E. 73, 46 L. R. A. 517. The rules governing the interpretation of statutes and Constitutions are practically the same. Kent's Comm., vol. IV, p. 441.

The conclusion announced in the opinion of Mr. Justice Hydrick cannot be sustained unless it should be held that there was an implied proviso to the effect that section 2, art. VII of the Constitution, should not be applicable if the election should be set aside for irregularities which would be

inconsistent with the express language of said section, and would defeat its admitted object.

Contesting an election is not a necessary or usual incident to the holding thereof; and the setting aside of an election is separate and distinct from the physical fact of holding it. The Constitution contemplates the physical fact of holding an election which is complete, although it may afterwards be set aside for irregularities. But there was also another object in view when the convention adopted the provision that an election should not be held oftener than once in four years. The people within the areas of the old counties not included within the proposed new county likewise have rights under the Constitution, as well as those within the area of the proposed new county. It is true they cannot participate in the election, but; as the old counties are affected by the result of the election, they have the right to insist that the new county should not be created, unless there was a compliance with all the conditions imposed by the Constitution. The convention foresaw that, if elections were allowed to be held *ad libitum,* the opponents of the new county would lose interest and become less viligant, and that the result of the election would be largely dependent upon the importunity of the proponents of the new county; hence the provision limiting the number of elections. Furthermore, a statute was enacted in 1908 (now section 644, Code of Laws 1912) which provides:

"That hereafter no election shall be ordered for the creation or establishment of any new county which shall embrace one-half or more of the area of any proposed new county *in which an election for its creation was defeated within four years next preceding the date of the filing of the petition for such new county."* (Italics added.)

It will be observed that the statute does not contain a proviso to the effect that its provisions should not be applicable in case the election was set aside. It is contended, however, that the word "defeated" shows that the legislature did not

contemplate an election that was set aside. It would be contrary to the rules of interpretation hereinbefore announced, to adopt such a construction. If the legislature had contemplated that the word "defeated" might be so construed, it is only reasonable to suppose that it would have used language that would have made their intention certain and definite. It seems to have been the intention of the legislature merely to enact in statutory form the provisions of the Constitution, and not to make any additions to those therein found, which it must be presumed to have known was beyond its powers. There is no case in the State decisive of the question involved. Several decisions have been cited from other States, but, of course, they are not authority in this State. There is, however, a provision in our Constitution which makes this case different from those just mentioned. Section 29, art. I of the Constitution, is as follows:

"The provisions of the Constitution shall be taken, deemed and construed to be mandatory, * * * and not merely directory, except where expressly made directory or permissory by its own terms."

Therefore, when the Constitution provides that an election upon the question of forming the same proposed new county shall not be held oftener than once in four years, no department of the government has the authority to allow more than one election, which would unquestionably defeat the plain intention of the Constitution.

For these reasons, I dissent.

CIRCUIT JUDGE DEVORE, *also dissenting.* I concur in the opinion announced by the CHIEF JUSTICE in so far as it holds that there has been an election for the reason that the elections held in Abbeville and Edgefield were legal, and that Greenwood county may be reduced.

MR. JUSTICE WATTS, *also dissenting.* I concur in the opinion of the CHIEF JUSTICE, except I do not agree with the construction of the CHIEF JUSTICE and JUSTICE HYDRICK in *Rhame* v. *DuRant,* 93 S. C. 217, 76 S. E. 611. That case was heard by four members of the Supreme Court. JUSTICE FRASER, being disqualified, did not participate. I concurred in the opinion of JUSTICE WOODS, which held that as soon as Lee county was created it became an "old county" within the meaning of the first six sections of the article providing for the formation of the new counties, and that, inasmuch as Lee county contains less than 500 square miles, it could not be reduced in area for the formation of a new county. I adhere to my conclusion in that case, and the undisputed facts in the case at bar show that Greenwood county, if the election is sustained, will be reduced below 500 square miles.

MR. JUSTICE GAGE and CIRCUIT JUDGE WILSON concur in the dissenting opinion announced by MR. JUSTICE WATTS.

CIRCUIT JUDGE GARY, *also dissenting.* I concur in so much of the opinion announced by MR. JUSTICE WATTS as holds that Greenwood county is an "old county" and cannot be reduced below 500 square miles, and concur in JUSTICE HYDRICK's opinion as to the election.

CIRCUIT JUDGE MOORE, *also dissenting.* I concur in the opinion announced by MR. JUSTICE WATTS, as to the proper construction of the words "old county."

The issues arising in this proceeding include questions as to the constitutionality and legality of the attempted formation and establishment of the proposed new county of McCormick out of portions of the existing counties of Greenwood, Abbeville and Edgefield. The constitutional questions involve the proper construction of the terms "old county" and "new county," as used in sections 1, 3, 4 and 5

of article VII of the State Constitution, but more particularly with reference to the meaning of the phrase "old county" in section 4 of that article; the contention of the petitioners being that these words have relation to the time of the formation of the "new county," while the respondents maintain that they have reference only to the date of the adoption of the Constitution. The issue arises with regard to that portion of the proposed county of McCormick which is sought to be taken from the pre-existing county of Greenwood, and its solution depends upon the conclusion to be reached upon the question as to whether the county of Greenwood is an "old county" within the meaning of section 4, art. VII of the Constitution.

It is admitted both by the proponents and the opponents of the new county thus sought to be established that, since Greenwood became a county subsequent to the adoption of the State Constitution of 1895, the question as to the constitutionality of formation of the proposed new county of McCormick primarily depends upon the construction to be given to the phrase "old county" as appearing in subdivision 4 of article VII of that Constitution. In other words, it is conceded by all parties to this proceeding that, if Greenwood is to be considered as an "old county" within the meaning of the section, then it must follow that the formation of the proposed new county of McCormick by the inclusion therein of that section of Greenwood county fixed by the limits determined for such new county would alter the previously existing limits of Greenwood county to such an extent as to reduce its area to less than 500 square miles, in violation of that article and section of the Constitution.

The question of constitutional construction thus presented is one which has not yet been determined in this State, since it was not necessarily involved in *Rhame* v. *DuRant,* 93 S. C. 217, 76 S. E. 611, which required only a determination as to the effect of the provisions of section 7 of the same article, relating solely to the alteration of county lines.

While the requirements of certain other sections of this article were incidentally discussed in that case, and varying conclusions with regard to the same were reached by the different members of the Court as then constituted, it is nevertheless clear that any opinions there expressed as to the proper construction of the terms "old county" and "new county," as employed in sections 3 and 4 of article VII of the Constitution, were merely *obiter dicta,* and cannot have the effect of a decision settling the meaning of these words as there used. The question now arising is, therefore, *res integra,* and is to be determined now by the application of the proper principles and rules of construction, with such aid only as may be derived from the opinions expressed in the case mentioned when considered as being merely persuasive.

Throughout the discussion of the propositions here involved it is to be remembered that the Constitution is that fundamental law which is intended to guide and control the legislative, executive, and judicial departments of the State throughout that considerable period naturally presumed as being within the contemplation of those who were engaged in framing it, during all of which time it is to speak the will of the people as a daily subsisting mandate with reference to the various primary and fundamental principles of government included within its terms and requirements. It must, therefore, be regarded as enunciating those principles as vital and enforceable at any date upon which the same may become applicable in the administration of the affairs of the State. Its provisions are intended to operate as a declaration of the continuing purpose of the people with reference to such matters as are therein embraced and as speaking the controlling will of the people as a continually abiding limitation upon the power of their representatives in the future administration of the various departments of the government thereby established.

In the Constitution of this State adopted in 1895, by section 4 of article VII, it is declared that "no old county shall

be reduced to less area than five hundred square miles;" and the query now advanced is as to what period of time this limitation has reference in the ascertainment of what is meant by the words "old county." Upon a critical and dispassionate view of the language used, when the nature and purpose of the provision is considered in its proper relation to other objects and requirements of the Constitution, it is scarcely too strong a form of expression to say that it appears to be manifest to the ordinary comprehension that the phraseology so employed must be held to refer to any political division of the State which can properly be denominated an "old county" at the date of the proposed erection of a new county. That period, and that period alone, was in the contemplation of the members of the constitutional convention at the time of the adoption of this provision as the date at which such a limitation would become applicable. They were undertaking to provide for the creation of new counties in the future, and that "time to come" was the period to which they must reasonably have had reference in seeking to protect existing counties, which might then be termed "old," from too extensive a dismemberment. The language used must, therefore, be held to refer to that future date, for the reason that it was the time contemplated by its users as the period when the provision for the protection of "old counties" would become operative by way of practical application. The operation of this section must be considered as being prospective, and, being continuous, it must be considered as being applicable at any and all times in the future when a new county should be proposed. See Cooley's Const. Lim. (5th ed.), p. 76; 8 Cyc. 731. This conclusion appears so patent as to require no demonstration to uphold it, being so evident as scarcely to allow room for argument in its support. Indeed, paradoxical as it may seem, this is an instance of the truth that an inference may be so obvious as to be rendered apparently obscure and uncertain by the very effort to prove that it necessarily results from the pre-

mise admittedly existing. Nevertheless some further considerations may be mentioned as fortifying the conclusion already stated.

It is apparent that the provision under discussion was intended to become operative at such time as a new county should be proposed, the proper formation of which was then to be contemplated. Hence it is significant that in the enumeration of the constitutional prerequisites to the formation of a "new county" the petition for the establishment thereof, as required by section 1 of article VII, must in all cases be made by the "electors within the area of each section of an old county proposed to be cut off to form a new county." The conclusion is practically irresistible that with reference to such new county then to be proposed any and every county then existing was regarded as being an "old county." Otherwise, and if the construction contended for by the respondents should prevail, the conclusion would be inevitable that no "new county" could at any time be created by the inclusion therein of any section of a county not existing as such at the date of the adoption of the Constitution. This would be true in that event for the reason that the Constitution nowhere provides for the taking of any section of a "new county" to form another county therefrom, and permits only the taking of territory from an "old county" for that purpose. Hence it must follow that, if the contention of the respondents be adopted, and it be held that Greenwood is not an "old county" within the meaning of section 1 of article VII, there is no authority thereunder for the taking of any part of the territory of such "new county" of Greenwood for the purpose of forming the proposed county of McCormick. Either horn of the dilemma, therefore, is equally fatal to the end sought by the proponents of the county of McCormick; for, if the term "old county," as used in the first section of article VII of the Constitution, can be held to include Greenwood, no reason has or can be advanced

why it does not likewise embrace Greenwood when employed in the fourth section of the same article.

Viewing, then, the provisions of the section here in controversy in the light of the obvious considerations already suggested, what meaning was intended to be conveyed by the term "old county" as there used? In answering this question it is especially to be noted that these words are employed in apposition to the phrase "new county," and that they are so used with particular reference to the matter of providing for the establishment of a "new county." The object of the provisions contained in sections 1 to 6, inclusive, in article VII; is solely that of fixing limitations upon the power of the legislature to establish new counties thereafter. Keeping this manifest purpose in view, what idea was in the minds of the framers of these sections and was sought to be given expression by the word "old" as applied to a county? Evidently and admittedly the idea then dominant was that of the reasonable certainty that it would become desirable at various future and more or less remote dates to establish additional counties in this State. The members of the constitutional convention, therefore, when they made use of the expression "old county," did not have the then present time of 1895 in view, but were contemplating the years of the future, including 1915, 1925, 1950, and later periods. The language and phrasing used must, therefore, be construed with particular reference to the periods at which it was intended and expected to become applicable.

One of the principal definitions of the word "old" is that of "existing or subsisting before something else;" and that is unquestionably, and, it may be said, admittedly, the sense in which the word was used in the section of the Constitution now for interpretation. Applying this meaning to the word as appearing in the clauses in controversy, and remembering that the purpose thereby sought to be accomplished was that of providing for the erection of new counties in the remote as well as the less distant future, there can be little

(if any) room for doubt that the members of the constitutional convention had reference by the term "old" to those counties which could properly be so characterized at such future date, when considered in apposition to the new counties then to be proposed. Thereupon, with direct reference to such distant period as well as to the nearer future, they declared that in the formation of such a new county "no old county shall be reduced to less area than five hundred square miles." Substituting the definition of "old" which has already been given, and which is the only meaning of the word which could reasonably have been within the contemplation of the framers of these provisions, the manifest meaning of this section is found to be that, "in forming a new county hereafter, no then existing county shall be reduced to less area than five hundred square miles." Any other construction would be open to the patent objection that it ignores the end sought to be accomplished by the framers of these sections, and disregards the fact that they were seeking to establish, not only a minimum area for new counties thereafter to be created, but also a higher minimum below which counties once established should not afterwards be reduced. They, therefore, declared that no county thereafter created should contain less than 400 square miles, and that, once established, no county of the State should ever be reduced in extent, unless its area exceeded 500 square miles, and in that event only to the amount of such excess, if so desired. Neither in the language used in the Constitution itself nor in the debates and proceedings of the constitutional convention has anything been found to show that the members of that convention had. any other or different purpose in view than that of declaring as a general principle, where counties had once been established, either before or after the adoption of that Constitution in 1895, that any such established county should not be further reduced in territory, unless it exceeded 500 square miles in area, and in such case only to the extent of such excess.

20—104

So far as concerns the meaning of the term "new county" as applied to the enforcement of the provisions contained in section 7 of article VII of the Constitution, with regard to the alteration of county lines, it need only to be remarked that such meaning has already been adjudicated by the decision in *Rhame* v. *DuRant*, already cited. As is said by Justice Woods in that case, however, it is not a cogent objection that the word "new" is employed in its application to one section of a Constitution, with reference to the alteration of county lines, in a different sense from that in which it is used in another section, relating to the formation of new counties.

In construing sections 4 and 5 of article VII, however, it would lead to manifest absurdity to adopt the construction contended for by respondents as to the meaning of the phrase "old county" as employed in each of these sections. That absurdity would consist in the interpretation of the intent of the framers of the Constitution as seeking to provide that no county existing at the time of the adoption of the Constitution of 1895 should be so cut down as to reduce its area below 500 square miles or to bring its boundary within 8 miles of its courthouse building, while at the same time permitting both of these results to be accomplished by the subsequent cutting down of any county established after the adoption of that Constitution. So to conclude would be to attribute to the convention a care and preference for counties existing in 1895, however newly created, to the exclusion of any such feeling in behalf of counties to be thereafter erected. There is no warrant to be found for any such conclusion, either in the language employed in the instrument itself or in the debates and other proceedings of the convention. Even if the newspaper reports of these debates and proceedings are entitled to any consideration, there is nevertheless no sound inference to be deduced therefrom which is entitled to be given any special weight in

determining the question here presented. If it be conceded that special interest was felt by the members of the constitutional convention in providing against the too extensive dismemberment of the counties then existing, there is nothing to show that these members were not also impressed with the advisability of likewise making provision for similar protection against the continued cutting down of area or boundary of counties which should thereafter be established. Hence no firm ground can be found in these debates upon which to rest a conclusion that the members of the convention desired to protect then existing counties against a reduction of area below 500 square miles and encroachments upon boundary lines within 8 miles of the courthouse, without intending to give like protection so far as possible to counties thereafter formed, when the same had once been established. Consequently the light to be derived from this source fails to serve any particular purpose of illumination as to the matters here in controversy, and we are still remitted to the language used in the Constitution itself for a proper interpretation of its provisions in this particular.

As especially significant of the sense in which the term "old county" is used in section 4 of the article now sought to be interpreted, it is to be noted that the same phrase, in relation to the same general subject matter, is used apparently with the same meaning in section 6 of this article. Manifestly in the last mentioned section the word "old," as applied to county, is used with reference to any county existing at the time a proposed "new" county is to be formed. This section declares that:

"All new counties hereafter formed shall bear a just apportionment of the valid indebtedness of the old county or counties from which they have been formed."

It is too clear for argument that the word "old" in this section must be interpreted as meaning any county in existence at the date of the formation of such new county, since

otherwise the constitutional convention would stand convicted of the absurdity of requiring the assumption by such new county of a just proportion of the debt of any section thereof taken from a county existing in 1895, without making any such requirement as to such a debt with reference to any section taken from a county subsequently created.

Moreover, in section 2 of article VII of the Constitution, there is found a precise definition given by the constitutional convention itself of the meaning of the term "old county," which is there translated by the phrase "the county proposed to be dismembered." By section 1 of this article it is provided as a prerequisite to the formation of a new county that there shall be a petition by "one-third of the qualified electors within the area of each section of an old county" out of which such new county is to be formed. Thereupon, as if for the very purpose of defining the meaning of the words "old county," the convention proceeded in the very next section to characterize the term "old county" by substituting therefor the equivalent phrase, "the county to be dismembered." Having used the words "old county" in the first section of this article in the sense of the "county to be dismembered," when reference is again made to the same "old county" in the fourth section of the same article, with reference substantially to the same subject, with what reason can it be contended that the meaning of the phrase has suddenly, mysteriously, and unnecessarily been changed? No reasonable foundation for such a conclusion has been suggested; and so to conclude without reason to support it would be to violate the rule that the same words, when used with reference to the same general subject matter, are to be considered as intended to convey the same meaning. Cooley's Const. Lim. (5th ed.), p. 74; 2 Cyc. 734.

It may be added that the construction thus placed upon the words "old county," as used in the section under consideration, as being "any county existing at the time of the

proposed formation of a new county," is identical with that which appears to have been adopted in contemporary legislative enactments, appearing now as sections 634, 637, 639, 641, and 642 of the Civil Code. It is well settled that such contemporaneous interpretation raises a strong presumption of the correctness of a legislative construction then adopted. Cooley's Const. Lim. (5th ed.), p. 81; 8 Cyc. 736.

The true meaning of these provisions of the Constitution must, therefore, be held to consist in the declaration that counties might thereafter be established with an area of not less than 400 square miles, and with the courthouse located at such point within the limits as the qualified electors should determine, but that, when once established, no county of the State should be further reduced in limits (in order to form a new county) unless the same should exceed 500 square miles, nor should any of its existing area be taken in any event (for the purpose of forming a new county) if thereby the line of such established county would be so altered as to bring it within eight miles of its courthouse building. These provisions were manifestly intended as guaranties of protection to the people of the county so established in the continued territorial autonomy of the county to the extent thus declared. In other words, the Constitution says to the people that, if they will establish new counties with not more than 500 square miles of area, they will be guaranteed against the taking of any part thereof thereafter in order to the erection of any other proposed county, and that, if they will locate their county courthouse building not nearer than a distance of 8 miles from any particular border, no other new county will be permitted to cut its lines within the limits of that border in any event. These provisions are made applicable not only to counties existing at the time of the Constitution, but to those thereafter created, so as to protect all of them against dismemberment within the 500 square miles of area, as well as within the 8 miles limit of border line.

Such construction of these provisions gives proper force to the language used and renders the requirements as to the creation of new counties and as to the reduction of limits of existing counties reasonably harmonious; while the adoption of the other interpretation for which contention is made by respondents would lead to many absurd conclusions. The latter construction, for instance, would require the attributing to the makers of this Constitution of the unreasonable intention of declaring that a county established prior to 1895, however recent its creation, could not be reduced below 500 miles in area, nor be cut within 8 miles of the established courthouse, in order to form a new county, while one erected subsequent to that date could be so reduced or so cut for the very identical purpose. Since there is no reasonable basis for such a distinction, a conclusion involving it should not be adopted, unless it be required by necessary intendment from the language of the Constitution itself. It has been shown already, however, not only that no such construction is demanded by the phraseology of that instrument, but also that it is absolutely forbidden by the very definition of "old county" given by the Constitution itself; and it has further been shown that the term "old county," when used in apposition to "new county" in a constitutional provision relating to the formation of such counties, necessarily requires the adoption of that meaning which defines the phrase "old county" as being "any county existing at the time of the proposed formation of a new county."

Hence it must be concluded that the county of Greenwood is an "old county," within the meaning of the language used in section 4 of the seventh article of the Constitution of this State, and that its area cannot now be reduced below that of 500 square miles in order to form the proposed new county of McCormick. This conclusion renders it unnecessary to pass upon the other questions sought to be raised by the petition herein, while it also requires the granting of the prayer of the petitioners.

It is, therefore, considered that it should now be ordered and adjudged that all further proceedings looking to the establishment of the proposed new county of McCormick under and by virtue of any election heretofore had or attempted be, and the same are hereby, permanently enjoined and restrained, and that all sections of the various counties sought to be incorporated in the proposed new county of McCormick be, and they are hereby, declared to remain parts of the several counties respectively to which they have heretofore belonged.